UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> CRAIG L. CLAVIN  and LIGHTHOUSE FUTURES, LTD, <br><br> Defendants. | Case No.: 2:20-cv-2591 <br><br> ECF CASE <br><br> **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** <br><br> JURY TRIAL DEMANDED |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.    SUMMARY

1.    From at least 2015 through in or about May 2019 (the "Relevant Period"), Craig L. Clavin ("Clavin"), individually and as agent and principal of Lighthouse Futures Ltd. ("Lighthouse Futures"), and Lighthouse Futures (collectively "Defendants"), operated a fraudulent scheme in which they solicited and accepted funds for "Lighthouse Futures Commodity Pool" a pooled investment vehicle for the purported purpose of trading commodity futures contracts and other "commodities."

2.    Clavin, as an officer and agent of Lighthouse Futures, knowingly or recklessly made fraudulent and material misrepresentations and omissions about his commodities trading and returns to persuade individuals ("Pool Participants") to transfer at least $345,000 to Defendants for the purpose of participating in a pooled investment vehicle.

3.      To entice prospective Pool Participants, Defendants knowingly and falsely represented that they were running a successful commodity pool.  The investments in the pool were to be made in increments of $10,000 and Defendants imposed certain investment provisos, including that Pool Participants were required to keep their investments in the pool for at least one year.  At the end of the year, profits would be split evenly between the Pool Participant and the Defendants and the Pool Participants could opt to reinvest their profits if they chose not to withdraw them.  Defendants sent periodic account reports to the Pool Participants, which consistently but falsely showed profits from the trading of commodity futures contracts.  During the Relevant Period, Defendants claimed that the Lighthouse Futures pool had annual profits ranging from 10% to 14%.

4.      Defendants failed to trade the vast majority of Pool Participants' funds as promised and, instead, misappropriated most of their money.  Some pool funds were misappropriated for Clavin's personal benefit, while other pool funds were misappropriated for Lighthouse Futures' benefit to pay certain Pool Participants purported profits from funds deposited by other Pool Participants in the manner of a Ponzi scheme, rather than from trading profits as Defendants claimed.

5.      By virtue of this conduct and the conduct further described herein, Defendants have engaged, are engaging, or are about to engage in acts and practices in violation of  anti-fraud Sections 4*o*(1)(A)-(B), and 6(c)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6*o*(1)(A)-(B), 9(1) (2018), and Commission Regulation ("Regulation") 180.1(a), 17 C.F.R. § 180.1(a) (2019).  Furthermore, Defendants have violated Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2019), which prohibits a commodity pool operator ('CPO") from commingling property of a pool it operates or intends to operate with property of another person.

6.     In addition to the above-described fraudulent conduct, Defendant Lighthouse Futures made use of the mails or any means or instrumentality of interstate commerce and acted at all times during the Relevant Period as a CPO by soliciting, accepting and/or receiving funds for a pooled investment vehicle without being registered with the Commission as a CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018).

7.     Similarly, Defendant Clavin solicited funds for participation in a pooled investment vehicle for the purpose of trading commodity futures, while associated with Defendant Lighthouse Futures as an officer, employee, or agent, without being registered with the Commission as an associated person ("AP") of Lighthouse Futures, in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2018), and Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2019).

8.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and the Regulations promulgated thereunder.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary or appropriate.

9.     Unless restrained and enjoined by this Court, Defendants will likely continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as described below.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. §1345 (2018) (providing that U.S. district

courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), provides that the U.S. district courts have jurisdiction to entertain actions brought by the Commission for injunctive relief or to enforce compliance with the Act or any rule, regulation or order thereunder, whenever it shall appear to the Commission that a person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder.

11.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018), because Defendants transact or transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.  Specifically, several of the defrauded Pool Participants reside in and were solicited in this District, and Defendants' last known business and residential addresses are in this District.

### III.    THE PARTIES

12.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the responsibility of administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1-26 (2018), and the Commission's Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2019).  The Commission maintains its principal office at 1155 21st Street N.W., Washington, DC 20581.

13.    Defendant **Craig L. Clavin** is a resident of Suffolk County, New York.  Clavin is the Chief Executive Officer, President and sole owner of Defendant Lighthouse Futures.  Clavin has never been registered with the Commission in any capacity.

14.     Defendant **Lighthouse Futures Ltd.** was incorporated in New York State on April 5, 1995.  Lighthouse Futures has never been registered with the Commission in any capacity.

## IV.     STATUTORY AND REGULATORY BACKGROUND

15.     A "commodity pool" is defined in Section 1a(10) of the Act, 7 U.S.C. § 1a(10) (2018), in relevant part, as any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests.

16.     A "commodity pool operator" is defined in 7 U.S.C. § 1a(11)(A), in relevant part, as any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests.

17.     An "associated person" of a commodity pool operator is defined in Regulation 1.3 (aa)(3), 17 C.F.R. 1.3 (aa)(3) (2019), in relevant part, as "a partner, officer, employee, consultant, or agent . . . in any capacity which involves . . . the solicitation of funds, securities, or property for a participation in a commodity pool."

18.     A "participant" in a commodity pool is defined in Regulation 4.10(c), 17 C.F.R. § 4.10(c) (2019), in relevant part, as any person who "has any direct financial interest in a pool."

19.     The operator of a commodity pool is prohibited by Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2019), from commingling pool funds with the funds of any other person.

20.     With the exception of certain exemptions and exclusions, Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018), makes it unlawful for any CPO to make use of the mails or any

means or instrumentality of interstate commerce in connection with its business unless registered with the Commission.

21.     Among other exemptions to the requirement that CPOs must register with the Commission, Regulation 4.13(a)(2), 17 C.F.R. § 4.13(a)(2) (2019), provides that a CPO may claim exemption from registration if none of the commodity pools operated by the CPO has more than 15 participants at any time and the total gross capital contributions it receives do not total more than $400,000.

22.     Any person who desires to claim an exemption to the requirement that CPOs must register with the Commission, must file a notice of exemption from registration with the National Futures Association and must affirm on an annual basis the notice of exemption, Regulation 4.13(b), 17 C.F.R. § 4.13(b) (2019).

23.     Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2018), and Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2019), requires an associated person of a CPO to register with the Commission and makes it unlawful for a CPO to permit such a person to become or remain associated with it in any such capacity if the CPO knew or should have known that such person was not so registered or that such registration had expired, been suspended or revoked.

## V.     FACTS

### A.     Defendants' Fraudulent Solicitation and False Statements

24.     Clavin incorporated Lighthouse Futures on April 5, 1995, in New York State. The incorporation listed Clavin as the Chief Executive Officer for Lighthouse Futures, listing the same address for Clavin and for Lighthouse Futures' "Principal Executive Office."

25.     During the Relevant Period, Defendants fraudulently solicited customers by claiming to be running a successful commodity pool.  Defendants solicited and received at least

$345,000 from at least 4 Pool Participants for the purpose of trading commodity futures contracts on behalf of the participants.  Some of these Pool Participants were Clavin's acquaintances and members of the public.

26.     In the welcome letter, which was generally emailed to Pool Participants and which effectively acted as the pool agreement between Defendants and the Pool Participants, Defendants welcomed them into the "Lighthouse Futures Commodity Pool."  The letter indicated that the pool would be managed by Lighthouse Futures Ltd., "and will participate in commodities markets."  Further, the welcome letter/agreement stated that "Lighthouse Futures Ltd., is wholly owned by Craig L. Clavin, who will personally guarantee to return your investment in full, including the cost of brokerage commissions, at the end of one (1) year." Citing CFTC Regulation 4.13(a)(2), the letter/agreement erroneously suggested that Defendants were exempt from registration with the CFTC because the pool had fewer than 15 participants and under $500,000 gross capital contributions.  The letter further stated:

> When a pool consists of fifteen (15) members or less, it is not required to register with the Commodity Futures Trading Commission (CFTC). Pursuant to Section 4.13 (a)(2) of the Commodity Exchange Act, a person is not required to register under the Act as a commodity pool operator if: (I) the total gross capital contribution it receives for units of participation does not have an aggregate greater than $500,000, and (II) none of the pools has more than fifteen (15) participants at any time.

Finally, the letter indicated that "profits will be divided on a (50/50) basis between the investor and the pool operator."  The welcome letters/agreements contained the signature of the Pool Participant below the words "Read and agreed to," and above "Investor's Signature." Additionally, the initials "CLC" appeared above the title "President."

27.     The Defendants required Pool Participants to maintain their investment in the pool for a year at a time.  At the end of the year, Pool Participants could opt to take their profits,

or reinvest them in the pool, and they could maintain their principal in the pool or withdraw part or all of it.

28.     Defendant Clavin, on behalf of Lighthouse Futures, sent Pool Participants pool reports throughout the year.  These reports were narrative in form, provided an update on the purported performance of the pool, and would sometimes reference the pool's trading in certain futures contracts such as soybean oil futures, soybean futures, heating oil futures and gasoline futures.  For example, in a report to Pool Participants dated January 5, 2018, Clavin stated, "I entered a futures spread trade of buying 3 contracts of December heating oil and selling 3 contracts of December gasoline ....  I have done this same seasonal transaction at least 15 times over the years.  I unwound this trade on November 21st , by buying 3 contracts of December gasoline and selling 3 contracts of December heating oil, and getting out of both positions. The trade was profitable..."

29.     Clavin also sent Pool Participants a summary statement showing the amount of purported profit made that year and the purported balance in their account.  In some years, Clavin also sent some Pool Participants an IRS 1099 Form indicating their purported annual profits for that year.  Below is a table of the pool's purported profits the Defendants reported for specific years:

| Year | Reported Pool Profit |
|------|---------------------|
| 2013 | 18.06% |
| 2014 | 15.10% |
| 2015 | 14.06% |
| 2016 | 10.16% |
| 2018 | 11.86% |

30.     Clavin would also compare the pool's performance in his reports to that of other investment vehicles such as the "S&P 500 Index Return," the " 1 Year NY Times CD Rate" and

the "30 Year Interest Rate Swap."  Invariably, Clavin represented that the pool's performance exceeded that of the other investments he listed for comparison purposes.

31.     During the Relevant Period, Clavin had futures trading accounts at two futures commission merchants ("FCM").  Both accounts were in Clavin's name, not Lighthouse Futures. During the life of these two accounts, Clavin deposited at least $80,000 into these accounts. Clavin traded minimally, lost a net total of $2,944, and by August 2018 withdrew the approximate balance of $77,116.  Based upon information and belief, Defendants never opened a futures trading account in the name of Lighthouse Futures.

**B.**     **Defendants' Commingling of Funds and Misappropriation**

32.     Defendants commingled pool funds by depositing funds received from Pool Participants in a bank account in the name of Lighthouse Futures, which contained other funds, such as cash deposits, a loan from a relative of Clavin, and transfers from Clavin's personal bank account.

33.     As in a typical Ponzi scheme, Clavin, on behalf of Lighthouse Futures, sent Pool Participants a check, generally by mail, of their purported profits at the end of each year, if they requested it.  For example, in January 2017, Clavin, on behalf of Lighthouse Futures, sent checks by mail to a number of Pool Participants which purported to be their portion of the profits earned for that year.  Or, if Pool Participants requested part or all of their principal, he also sent them a check.  For as long as it appeared that Pool Participants were profiting each year, most maintained their principals in the "pool" which allowed Defendants to perpetuate their fraud.

34.     During the life of the pool, Defendants returned part of Pool Participants' money to them as purported profits in the manner of a Ponzi scheme and misappropriated the rest of it. The bank account records for Lighthouse Futures show that Clavin transferred money, which

included pool funds, to and from the Lighthouse Futures bank account and his personal bank account. The Lighthouse Futures bank records also show that Clavin used money from the Lighthouse Futures bank account, which included pool funds, to pay for credit card accounts in his name and in the name of a bar/restaurant owned by Clavin and located in Port Jefferson, N.Y.; there were 13 such payments made between December 2014 and May 2016.

35.     Further, Clavin misappropriated funds from the Lighthouse Futures bank account to pay bills associated with a Lighthouse Futures credit card which he used for the following personal items:

- Patio furniture

- A trip to Las Vegas

- Meals at restaurants

- Swimming pool supplies

- Insurance

- StubHub

- Liquor

- Cash Advances

36.     Additionally, Clavin misappropriated Lighthouse Futures funds for debit card purchases made at The Home Depot and GM Financial, and for medical expenses. Defendants misappropriated Pool Participants' funds by use of the mails or other means or instrumentalities of interstate commerce. For instance, Clavin mailed a check for $75,000, dated January 1, 2016, to a Pool Participant purporting to be their portion of the pool profits for 2015. The check contained the name and address of Lighthouse Futures Ltd. at the top and appears to have been drawn from the Lighthouse Futures bank account.

C.    **The Unraveling and Concealment**

37.     Defendants' scheme began to unravel in late 2017 when Defendants stopped sending Pool Participants their purported year-end profits.  The excuse for failing to distribute profits to the Pool Participants that Defendants, through Clavin, initially provided via email, was that the "brokerage firm" had executed a trade on behalf of the pool that Clavin had not authorized, resulting in a large loss to the pool.

38.     Clavin claimed that they were in arbitration with the brokerage firm and in a May 2018 written communication to Pool Participants, he wrote "The Decision has been made by the arbitration judge and we won on all parts."  Clavin further wrote "Once the judge receives the check, our lawyer will be notified and I will go to NYC to sign paperwork and receive our money."

39.     On June 29, 2018, Defendants made another excuse for not providing Pool Participants profits when Clavin wrote to them that "the Court had decided that our former brokers were judged unfairly due to a procedural error made by the arbiter."  Specifically, "the brokerage's claim was damaged" because the Arbiter had requested and received documents from the brokerage "outside of his scope of practice."  Thus, according to Clavin, the brokerage firm was given the right to be re-heard.  Clavin concluded the letter by telling Pool Participants that he would keep them apprised of developments and promised to send them 1099 forms for 2017.  Defendants did not provide pool participants an annual profit figure for 2017.

40.     Defendants maintained their ruse with a steady stream of communications to Pool Participants in which they provided updates of purported settlement discussions between their lawyer and that of the brokerage firm.  These communications chronicled gradually higher

settlement offers from the brokerage firm which were not accepted by Lighthouse Futures' attorney who was supposedly holding out for a better offer.

41.     In addition to the settlement updates, Defendants reported to Pool Participants purported bi-monthly year-to-date performance figures for the Lighthouse Futures pool.  For instance, in a January 18, 2019 report, Defendants reported the pool's 2018 performance as +11.86%, far superior to the performance of the "30 Year Interest Rate Swap," the "1 Year NY Times CD Rate" and the "S&P 500 Index Return."

42.     In the same January 18, 2019, report, Clavin wrote that "We are also waiting for our end of year balance to be corrected by our new firm, [sic] we had signed up to use their workstation and pay for the market data involved with using their workstation with a sliding scale for transaction fees, based on average monthly number of contracts, both futures and futures options."  As the scheme was coming apart, Defendants continued to conceal their misappropriation of Pool Participants' funds.

43.     In February 2019, Defendants provided yet another excuse and Clavin wrote that there would be a delay in the negotiations with the brokerage firm due to the death of their attorney's father.  Their attorney was supposedly required to travel to Texas for the funeral and to wind up his father's affairs.  Clavin added that a settlement meeting was scheduled for March 7, 2019, their attorney's first available date.

44.     Clavin continued his ruse in a March 9, 2019 letter to Pool Participants by writing that the brokerage firm agreed to a settlement of 75%, or seventy-five cents on the dollar.  Among other things, Clavin wrote that he was going to their lawyer's office on "Thursday and sign off on everything . . . ," and meet with the accountant on "Friday and cut everyones [sic] check on the weekend."

45.     On March 14, 2019, Clavin wrote that there was another delay in their attorney's receipt of the checks because, unwittingly, their attorney had "signed off on a grace period of 7 business days from the date of the agreement," which Clavin characterized as "payback" by the brokerage firm for having to settle for an additional 2%, which brought the total settlement to 75%. Clavin stated that he would meet with their attorney on March 28, 2019 instead.

46.     On March 28, 2019, Clavin wrote to Pool Participants that he met with their attorney, signed paperwork and "left with our check." However, Defendant's issuance of profit checks would be delayed further because, Clavin wrote, the accountant had rescheduled their appointment to April 6. "After he gives me the final numbers, I will get the checks out. The actual 1099s will follow suit."

47.     On April 8, 2019, Clavin wrote to Pool Participants that the accountant had moved up the appointment but when Clavin showed up, the accountant was not present. Clavin stated that the accountant, who supposedly had pre-existing gall bladder problems, was stricken with a gall bladder attack the day before the appointment which required hospitalization and surgery. The accountant, however, "planned to bring in another accountant to help him next week." On April 15, 2019, Clavin wrote to Pool Participants that he was scheduled to meet with the accountants on April 18.

48.     In an April 29, 2019, email to a Pool Participant, Clavin wrote that he had "Just dropped checks into the post office mailbox." Aside from a few text message responses to a Pool Participant in May 2019 in which Clavin represented that he had mailed the profit checks to Pool Participants, Clavin stopped responding to Pool Participants' emails, texts and telephone calls. Pool Participants never received their 2017 profits or their principal.

49.     Throughout the Relevant Period, Defendants falsely and fraudulently represented to Pool Participants that Defendants used Pool Participants' funds profitably to trade futures contracts.  In various letters emailed to Pool Participants, Defendants represented that they had successfully traded futures contracts, including soybean oil contracts, soybean contracts, gold contracts, silver contracts, heating oil contracts, and gasoline contracts.

50.     In fact, Defendants did not conduct futures trading on behalf of Pool Participants, but instead intentionally misappropriated Participants' funds for Defendants' own benefit and for Clavin's personal use.

51.     Defendants made the misrepresentations and omissions alleged herein intentionally or recklessly and by use of the mails and/or other means or instrumentalities of interstate commerce.

52.     To date, despite repeated requests to Clavin for the return of their funds, most Pool Participants have not received their funds back from the Defendants.

53.     To the extent some Pool Participants have received funds back from Defendants, those funds were misappropriated by Defendants from other Pool Participants, in the nature of a Ponzi scheme.

**D.      Lighthouse Futures Acted as an Unregistered CPO, and Clavin Acted as an Unregistered AP of a CPO**

54.     During the Relevant Period, Lighthouse Futures, through Clavin, acted as a CPO by engaging in a business that is of the nature of a commodity pool, and in connection therewith soliciting, accepting and/or receiving funds for the purpose of trading in commodity futures. Furthermore, in connection with its business as a CPO, Lighthouse Futures made use of the mails or other means of interstate commerce, which required registration as a CPO.

55.     During the Relevant Period, Clavin acted in a capacity requiring registration as an AP of a CPO by soliciting customers and prospective customers for participation in a pooled investment vehicle, while associated with Lighthouse Futures as a partner, officer, employee, or similar agent.

56.     During the Relevant Period, Lighthouse Futures was not registered with the Commission as a CPO and did not file a notice of exemption from registration or any annual affirmation of a notice of exemption with the National Futures Association, and Clavin was not registered with the Commission as an AP of a CPO as required by the Act and Regulations.

**E.     Clavin Was a Controlling Person of Lighthouse Futures**

57.     Clavin was a controlling person of Lighthouse Futures.  Clavin was the Chief Executive Officer, President and sole owner of Lighthouse Futures.  Clavin told Participants that he was responsible for the trading at Lighthouse Futures and was the sole source of information for Pool Participants regarding Lighthouse Futures and their investments.  Clavin controlled the Lighthouse Futures Bank of America Account and, upon information and belief, was the sole signatory on the account, into which Pool Participants transferred funds for the purpose of trading futures.

**F.     Clavin Acted as an Agent for Lighthouse Futures**

58.     Through his solicitation of prospective and existing Pool Participants, his continued communication with Pool Participants regarding his purported trading success on behalf of Lighthouse Futures, commingling pool funds by depositing them in the Lighthouse Futures account which contained other funds, and misappropriating pool funds by paying funds to certain Pool Participants as purported futures trading profits from funds sent by other Pool Participants, Clavin acted as an agent of Lighthouse Futures.

## VI.      VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE—AGAINST ALL DEFENDANTS

### Violations of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B) (2018) (Fraud by a CPO and an Associated Person of a CPO)

59.      Paragraphs 1 through 58 are re-alleged and incorporated herein by reference.

60.      7 U.S.C. § 6*o*(1) makes it unlawful for CPOs and APs of CPOs

by use of the mails or any other means or instrumentality of interstate commerce, directly or indirectly – (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

61.      As alleged herein, during the Relevant Period, Lighthouse Futures, through Clavin, acted as a CPO by operating, soliciting and accepting funds for a commodity pool for the purpose of trading commodity interests.

62.      Clavin acted as an AP of a CPO by associating with Lighthouse Futures, a CPO, as a partner, officer, employee, consultant, or agent in a capacity which involved the solicitation of funds, securities, or property for participation in a commodity pool.

63.      Lighthouse Futures, through Clavin, and Clavin in his individual capacity, violated 7 U.S.C. § 6*o*(1)(A)-(B), in that by use of the mails in sending checks of purported profits to Pool Participants, and other means or instrumentality of interstate commerce including emailing Pool Participants fraudulent reports, they employed or are employing a device, scheme, or artifice to defraud actual or prospective Pool Participants, or engaged or are engaging in transactions, practices, or a course of business which operated or operates as a fraud or deceit upon actual or prospective Pool Participants.

64.     During the Relevant Period, Defendants violated 7 U.S.C. § 6o(1)(A)-(B), by, among other things:

  a.  Falsely claiming to Pool Participants that Clavin ran a profitable commodity pool;

  b.  Falsely reporting to Pool Participants that their funds were being used to trade futures contracts, including soybean oil futures, soybean futures, gold and silver futures, heating oil futures and gasoline futures;

  c.  Issuing false written account statements to Pool Participants, issuing false 1099 forms to Pool Participants and providing Pool Participants false statements to conceal why Defendants had not issued profit statements for 2017 or returned pool funds, including statements as to an arbitration and court hearing, delays by a brokerage firm, negotiations with a brokerage firm, and delays by an accountant, as detailed above; and

  d.  Misappropriating Pool Participants' funds for Clavin's personal benefit and to pay other Pool Participants in the nature of a Ponzi scheme.

65.     Clavin directly or indirectly controls Lighthouse Futures, and did not act in good faith or knowingly induced, directly or indirectly, Lighthouse Futures' violations alleged in this Count, and is thus liable for Lighthouse Futures' violations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018).

66.     The foregoing acts, omissions and failures of Clavin as alleged in this Count, occurred and are occurring within the scope of his employment, office or agency with Lighthouse Futures; therefore, Lighthouse Futures is liable for these acts, omissions and failures

pursuant to Section 2(a)(1)(B) of the Act ,7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2,

17 C.F.R. § 1.2 (2019).

67.     Each misrepresentation, omission of material fact, and misappropriation,

including but not limited to those specifically alleged herein, is alleged as a separate and distinct

violation of 7 U.S.C. § 6*o*(1)(A)-(B).

### COUNT TWO—AGAINST ALL DEFENDANTS

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018)**
**and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019)**
**(Fraud by Deceptive Device or Contrivance)**

68.     Paragraphs 1 through 67 are re-alleged and incorporated herein by reference

69.     7 U.S.C. § 9(1), makes it unlawful, in relevant part, for any person, directly or

indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a
> contract of sale of any commodity in interstate commerce, or for future delivery
> on or subject to the rules of any registered entity, any manipulative or deceptive
> device or contrivance, in contravention of such rules and regulations as the
> Commission shall promulgate by not later than 1 year after [July 21, 2010, the
> date of enactment of the Dodd-Frank Wall Street Reform and Consumer
> Protection Act] . . . .

70.     17 C.F.R. § 180.1(a), provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any
> swap, or contract of sale of any commodity in interstate commerce, or contract for
> future delivery on or subject to the rules of any registered entity, to intentionally
> or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme,
> or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material
> fact or to omit to state a material fact necessary in order to make the statements
> made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business,
> which operates or would operate as a fraud or deceit upon any person . . . .

71.     During the Relevant Period, as described above, Defendants have violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a), in that they have used or employed (or attempted to use or employ) a device, scheme, or artifice to defraud investors; made (or attempted to make) untrue or misleading statements of material fact or omitted to state a material fact necessary in order to make the statements made not untrue or misleading; and engaged (or attempted to engage) in transactions, practices, or courses of business that operated as a fraud or deceit on investors by, among other things:

a.   Falsely claiming to Pool Participants that Clavin ran a profitable commodity pool;

b.   Falsely reporting to Pool Participants that their funds were being used to trade futures contracts, including soybean oil futures, soybean futures, gold and silver futures, heating oil futures and gasoline futures;

c.   Issuing false written account statements to Pool Participants, issuing false 1099 forms to Pool Participants and providing Pool Participants false statements to conceal why Defendants had not issued profit statements for 2017 or returned pool funds, including statements as to an arbitration and court hearing, delays by a brokerage firm, negotiations with a brokerage firm, and delays by an accountant, as detailed above; and

d.   Misappropriating Pool Participants' funds for Clavin's personal benefit and to pay other Pool Participants in the nature of a Ponzi scheme

72.     Each and every misrepresentation or omission by Defendants, including but not limited to those specifically alleged herein, has been made intentionally or recklessly.

73.     Clavin directly or indirectly controls Lighthouse Futures, and did not act in good

faith or knowingly induced, directly or indirectly, Lighthouse Futures' violations alleged in this Count, and is thus liable for Lighthouse Futures' violations pursuant to 7 U.S.C. § 13c(b).

74.     The foregoing acts, omissions and failures of Clavin as alleged in this Count, occurred and are occurring within the scope of his employment, office or agency with Lighthouse Futures; therefore, Lighthouse Futures is liable for these acts, omissions and failures pursuant to 7 U.S.C. § 2(a)(1)(B) (2018) and 17 C.F.R. § 1.2 (2019).

75.     Each misrepresentation, omission of material fact, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

## COUNT THREE—AGAINST ALL DEFENDANTS

### Violations of Section 4m(1) of the Act, 7 U.S.C. 6m(1) (2018)
### (Failure to Register as a CPO)

76.     Paragraphs 1 through 75 are re-alleged and incorporated herein by reference.

77.     Lighthouse Futures acted as a CPO and made use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO by engaging in a business that is of the nature of a commodity pool, and, in connection therewith, soliciting, accepting and/or receiving funds from others for a pooled investment vehicle that engages in commodity futures transactions.  Lighthouse Futures  engaged in this conduct without being registered with the Commission as a CPO in violation of 7 U.S.C. §6m(1).  In the event that Lighthouse was eligible for an exemption from registration under Commission regulations, Lighthouse failed to claim such exemption from registration with the National Futures Association.

78.     Clavin directly or indirectly controls Lighthouse Futures, and did not act in good faith or knowingly induced, directly or indirectly, Lighthouse Futures' violations alleged in this Count, and is thus liable for its violations pursuant to 7 U.S.C. § 13c(b).

## COUNT FOUR—AGAINST ALL DEFENDANTS

### Violations of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2018) and Regulation 3.12(a), 17 C.F.R. § 3.12(a)(2019)
**(Failure to Register as an AP of a CPO)**

79.     Paragraphs 1 through 78 are re-alleged and incorporated herein by reference.

80.     During the Relevant Period, Defendant Clavin acted as an associated person of a CPO by soliciting funds, securities, or property for the Lighthouse Futures commodity pool. Clavin engaged in this conduct without being registered with the Commission as an AP of CPO Lighthouse Futures, in violation of 7 U.S.C. § 6k(2) and 17 C.F.R. § 3.12(a).

81.     During the Relevant Period, Defendant Lighthouse Futures knew or should have known that Clavin was not registered with the Commission as an associated person of Lighthouse Futures, and yet allowed Clavin to become or remain associated with Lighthouse Futures as a partner, officer, employee and/or agent in a capacity that involved the solicitation of funds, securities or property for a participation in a commodity pool in violation of 7 U.S.C. § 6k(2).

82.     The foregoing acts, omissions and failures of Clavin as alleged in this Count, occurred and are occurring within the scope of his employment, office or agency with Lighthouse Futures; therefore, Lighthouse Futures is liable for these acts, omissions and failures pursuant to Section 7 U.S.C. § 2(a)(1)(B) (2018) and 17 C.F.R. § 1.2.

83.     Clavin directly or indirectly controls Lighthouse Futures, and did not act in good faith or knowingly induced, directly or indirectly, Lighthouse Futures' violations alleged in this Count, and is thus liable for its violations pursuant to 7 U.S.C. § 13c(b).

## COUNT FIVE – AGAINST ALL DEFENDANTS

### Violations of Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2019)
### (Commingling Pool Property with Property of Others)

84.     Paragraphs 1 through 83 are re-alleged and incorporated herein by reference.

85.     17 C.F.R. § 4.20(c) provides that a CPO may not commingle the property of any pool that it operates with the property of any other person.

86.     During the Relevant Period, Defendant Lighthouse Futures violated 17 C.F.R. § 4.20(c) by commingling funds of the commodity pool it operated with the property or funds of another person when it deposited pool funds into the Lighthouse Futures bank account, which contained other funds, including cash deposits, a loan from a relative of Clavin, and transfers from Clavin's personal bank account.

87.     Each act of improper commingling of pool funds is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(c).

88.     Clavin directly or indirectly controls Lighthouse Futures, and did not act in good faith or knowingly induced, directly or indirectly, Lighthouse Futures' violations alleged in this Count, and is thus liable for Lighthouse Futures' violations pursuant to 7 U.S.C. § 13c(b).

## VII.     RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.     Enter an order finding that Defendants Clavin and Lighthouse Futures violated Sections 4*o*(1)(A)-(B), 6(c)(1), 4k(2), and 4m(1) of the Act, 7 U.S.C. §§ 6*o*(1)(A)-(B), 9(1), 6k(2),

6m(1) (2018), and Regulations 180.1(a), 3.12(a) and 4.20(c), 17 C.F.R. §§ 180.1(a), 3.12(a),

4.20(c) (2019);

B.       Enter an order of permanent injunction restraining, enjoining and prohibiting

Defendants Clavin and Lighthouse Futures, and their affiliates, agents, servants, employees,

successors, assigns, attorneys, and all persons or entities in active concert with them, who receive

actual notice of such order by personal service or otherwise, from engaging in the conduct

described above, in violation of 7 U.S.C. §§ 6*o*(1)(A)-(B), 9(1), 6k(2), and 6m(1), and 17 C.F.R.

§§ 180.1(a), 3.12(a), and 4.20(c);

C.       Enter an order of permanent injunction restraining, enjoining and prohibiting

Defendants Clavin and Lighthouse Futures, and their affiliates, agents, servants, employees,

successors, assigns, attorneys, and all persons or entities in active concert with them, who receive

actual notice of such order by personal service or otherwise, from, directly or indirectly:

1.   Trading on or subject to the rules of any registered entity (as that term is
defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

2.   Entering into any transactions involving "commodity interests" (as that term is
defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for accounts held in the
name of any Defendant or for accounts in which any Defendant has a direct or
indirect interest;

3.   Having any commodity interests traded on any Defendants' behalf;

4.   Controlling or directing the trading for or on behalf of any other person or
entity, whether by power of attorney or otherwise, in any account involving
commodity interests;

5. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6. Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a) (9), 17 C.F.R. § 4.14(a) (9) (2019); and

7. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. §3.1(a) (2019)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9).

D.     Enter an order requiring Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment interest thereon from the date of such violations, plus post-judgment interest.

E.     Enter an order requiring Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every person or entity who sustained losses proximately caused by Defendants' violations, including pre-judgment and post-judgment interest.

F.     Enter an order directing Defendants and any of their successors, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with or among Defendants and any of the clients whose

funds were received by them as a result of the acts and practices which constituted violations of the Act and Regulations as described herein.

   G. Enter an order requiring each Defendant to pay a civil monetary penalty under the Act, to be assessed by the Court, in an amount not to exceed the penalty described by Section 6c(d)(1) of the Act, 7 U.S.C. §13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, Tit. VII, §701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. §143.8 (2019), for each violation of the Act and Regulations, as described herein.

   H. Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2018).

   I. Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

## VIII. JURY DEMAND

   Plaintiff hereby demands a trial by jury.

Dated: June 10, 2020

    New York, N.Y.        Respectfully submitted,

                 /s/ Mark Picard
                 Mark Picard
                 mpicard@cftc.gov
                 Trial Attorney

                 David Acevedo
                 dacevedo@cftc.gov
                 Chief Trial Attorney

                 Manal M. Sultan
                 msultan@cftc.gov
                 Deputy Director

Commodity Futures Trading Commission
140 Broadway, 19th floor
New York, NY 10005
(646) 746-9733
(646) 746-9940 (facsimile)